**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 06-33227 |
| | ) | |
| SAI Holdings Limited, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Adv. Pro. No. 08-3036 |
| | ) | |
| SAI Administrative Claim | ) | Hon. Mary Ann Whipple |
| and Creditor Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Benecke-Kaliko AG, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF OPINION AND ORDER

This adversary proceeding is before the court on Defendant's motion and memorandum in support requesting an order finding that this is not a core proceeding ("Motion") [Doc. #31 & 32], Plaintiff's response [Doc. # 37] and Defendant's reply [Doc. # 42]. For the reasons that follow, Defendant's Motion will be granted.

**BACKGROUND**

Plaintiff is a liquidating trust created pursuant to the terms of the First Amended Plan of Orderly Liquidation and Distribution of SAI Holdings Limited ("SAI Holdings"), Sandusky Liquidating Company, LLC, fka Sandusky, Limited, and Athol Manufacturing Corporation that was confirmed in the underlying chapter 11 case ("chapter 11 Plan"). [Case No. 06-33227, Doc. ## 984 & 1146].[1] Plaintiff is authorized under the chapter 11 Plan to assert claims formerly held by SAI Holdings, Sandusky Liquidating Company, LLC, fka Sandusky, Limited, and Athol Manufacturing Corporation (collectively, "the SAI entities" or "Debtors"). [*Id.*, Doc. # 984, ¶ 4.9]. On February 19, 2008, Plaintiff commenced this adversary proceeding.

The following summary of facts alleged in the Amended Complaint form the basis of the claims alleged therein and revolve around the relationship of Benecke-Kaliko AG ("Benecke-Kaliko" or "Defendant") with SAI Holdings and Sandusky, Limited – both its contractual relationships and its relationship as a member of SAI Holdings, a limited liability holding company for entities engaged in the sale and production of vinyl products. [*See* Complaint, Ex. 1, §§ 1.1, 1.5].

Benecke-Kaliko was a party to the Operating Agreement of SAI Holdings ("Operating Agreement") and a Sales Representative Agreement entered into with Sandusky, Limited ("Sales Agreement"). The Operating Agreement required each member[2] to contribute all of their respective units of Sandusky, Limited to SAI Holdings as consideration for its interests in the company. [*Id.* at Recitals & § 2.1]. The Operating Agreement includes, among other things, non-competition provisions that prohibit Benecke-Kaliko from selling its products in North America except under certain specified circumstances and that "[a]ny such sales shall be subject to a commission in favor of Sandusky, Limited under an Agency Agreement in effect from time to time between Sandusky, Limited and Benecke-Kaliko." [*Id.* at § 6.1(b)]. Under the Sales Agreement, Sandusky, Limited, is designated the exclusive sales representative for Benecke-Kaliko in North America, [*Id.*, Ex. 2, p. 1], and Benecke-Kaliko is required to pay specified sales commissions to Sandusky, Limited for products sold by it in North America, [*id.* at §§ 5-6]. As Benecke-Kaliko's sales representative,

---

[1] The court takes judicial notice of the contents of its case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

[2] The members set forth in the Operating Agreement are Eastar, Inc., Sandusky Holdings, Inc., Benecke-Kaliko, and Kyowa Leather Cloth U.S.A., Inc. [Complaint, Ex. 1, p.1].

Sandusky, Limited provided Benecke-Kaliko with technical support, customer service, and sales and marketing assistance. [Complaint, ¶ 14]. The Sales Agreement is for an indefinite period but sets forth the circumstances under which it can be terminated. [*Id.,* Ex. 2 at § 9]. One such circumstance permitted Benecke-Kaliko to terminate the Sales Agreement "[i]n the event of bankruptcy, liquidation, settlement or financial difficulties of more than a temporary nature. . . ." [*Id.* at § 9(5)].

Shortly after the parties entered into the Operating Agreement in December 2002, Sandusky, Limited experienced a dramatic rise in its raw material costs. As a result, it developed a plan to lower costs by consolidating its Sandusky, Ohio plant with its North Carolina plant, which was a lower cost operation. The commissions paid by Benecke-Kaliko under the Sales Agreement were critical to maintaining Sandusky, Limited's cash flow while preparing for consolidation. [Complaint, ¶¶ 15-20]. Through its representation on SAI Holdings's board of directors and by other communications, Benecke-Kaliko was fully informed of the status of the cost reduction plan. [*Id.* at ¶ 21]. By letter dated August 26, 2005, just a few months before consolidation was to take place, Benecke-Kaliko invoked § 9(5) and stated that it was terminating the Sales Agreement with Sandusky, Limited due to financial difficulties of more than a temporary nature. [*Id.* at ¶¶ 24-25 and Ex. 3]. Plaintiff alleges that Benecke-Kaliko terminated the Sales Agreement in order to pressure Eastar, Inc., which held a majority ownership interest in SAI Holdings, to sell its interest to Benecke-Kaliko. [*Id.* at ¶ 26]. Although Benecke-Kaliko stopped paying commissions, Sandusky, Limited continued to provide it technical support, customer service, and sales and marketing assistance. [*Id.* at ¶¶ 28, 30]. Benecke-Kaliko's failure to pay commissions eventually led to the Debtors filing for relief under chapter 11 of the Bankruptcy Code on November 8, 2006. [*Id.* at ¶¶ 34-38].

After filing, Debtors planned to move forward with the consolidation of operations at the North Carolina plant and to sell the business as a going concern. [*Id.* at ¶ 39]. Lear Corporation, their largest customer, represented that it did not intend to resource the business it had with Debtors during the consolidation and sale process. Lear's continued business was critical to the success of the plan to sell as a going concern rather than selling on a piecemeal basis. [*Id.* at 40-42]. Because Benecke-Kaliko wanted to purchase the Debtors' business, it arranged a meeting with Lear, as did other prospective purchasers, to discuss Lear's requirements if the business was purchased and for Lear to determine if Benecke-Kaliko was an acceptable purchaser. [*Id.* at 46]. Benecke-Kaliko used this meeting to characterize Debtors' management as inefficient, ineffective and dishonest in an attempt to damage Debtors' relationship with Lear so that the value of the business would drop and Benecke-Kaliko could purchase it at a bargain price.

3

[*Id.* at ¶¶ 47-49]. Benecke-Kaliko's slander made Lear conclude that it needed to resource its business and it ultimately did resource its business to one of Debtors' competitors. [*Id.* at ¶¶ 50-56]. As a result, rather than selling the business as a going concern, Debtors were forced to sell their assets on a piecemeal basis for a fraction of the price that could have otherwise been obtained. [*Id.* at ¶¶ ].

Based on these factual allegations, Plaintiff alleges in its Amended Complaint that Benecke-Kaliko breached both the Operating Agreement (Count 1) and the Sales Agreement (Count 2) by, among other things, failing to pay commissions due under those agreements on products it sold in North America. It also alleges that Benecke-Kaliko was unjustly enriched by its actions (Count 3) and that it breached fiduciary duties owed to "SAI, SAI's creditors, employees and equity holders." [Doc. # 4, Amended Complaint, ¶¶ 79, 82].

## LAW AND ANALYSIS

There is no dispute, and the court agrees, that the claims alleged in Plaintiff's Amended Complaint are, at a minimum, related to Debtors' underlying chapter 11 case so that the district court has subject matter jurisdiction over this adversary proceeding. 28 U.S.C. §§ 1334(b); *Mich. Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co., Inc.*), 930 F.2d 1132, 1141 (6th Cir. 1991)( for purposes of determining district court jurisdiction under § 1334(b), court need only determine whether a matter meets "related to" status and need not differentiate among the categories therein). There is also no dispute, and the court agrees, that the district court has referred this adversary proceeding to this court by virtue of its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. The parties disagree, however, as to whether the claims are core or non-core. *See* 28 U.S.C. § 157(b)(1). Plaintiff also argues that Benecke-Kaliko has waived its right to file the instant Motion.

**I. Waiver**

Defendant previously filed a motion to dismiss this adversary proceeding for failure to state a claim upon which relief could be granted. Defendant brought its motion to dismiss under Federal Rule of Civil Procedure 12(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012. Plaintiff argues that, under Federal Rule of Civil Procedure 12(g), Benecke-Kaliko's Motion requesting an order finding that this is not a core proceeding is improper since the issues raised were not raised in its Rule 12(b) motion previously filed.

Rule 12(g)(2) provides: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion

4

under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(g) requires a movant to consolidate only its Rule 12 motions. *Levit v. Herbst (In re Thomas Consol. Indus., Inc.)*, 289 B.R. 647, 653 (N.D. Ill. 2003). The court concludes that a motion to determine whether a proceeding is core is not a Rule 12 motion. The statute provides only that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding...." 28 U.S.C. § 157(b)(3). Other than the statutory requirement of timeliness, neither the statute nor the Federal Rules of Bankruptcy Procedure specify the applicable procedure for or characterize such a motion. *Cf.* Fed. R. Bankr. P. 7012(b). A request for a determination that a proceeding is or is not a core proceeding is not addressed within the text of Rule 12 or Rule 7012, and Defendant is not seeking through the Motion dismissal, judgment, a more definite statement or to have any material stricken from the record, which are the types of relief contemplated under Rule 12.

Of the matters governed by Rule 12, the Motion comes closest to addressing whether there is a lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The bankruptcy jurisdiction analysis first requires "asking whether there is subject matter jurisdiction, an inquiry under 28 U.S.C. § 1334." *Adelson v. Smith (In re Smith)*, 389 B.R. 902, 909-10 (Bankr. D. Nev. 2008). Then, "[o]nce such jurisdiction is established, the inquiry next focuses on which federal court should hear the matter," *id.* at 910, an inquiry under 28 U.S.C. § 157. The issues raised by the Motion are "step two" § 157 jurisdiction allocation issues and not "step one" § 1334 jurisdiction conferral issues, the latter being the type of issues in the bankruptcy context that this court construes as being within the contemplation of Rule 12(b). *But see Sanders Confectionery Prod., Inc. v. Heller Fin'l, Inc.*, 973 F.2d 474, 483 (6th Cir. 1992)(Sixth Circuit states that "[a]lthough the bankruptcy court would not have subject matter jurisdiction over a non-core related proceeding...", a statement this court regards as inadvertent given the surrounding discussion noting that although the bankruptcy court could not render a final decision in such a proceeding "it could hear the matter and refer it to district court" on proposed findings of fact and conclusions of law). Moreover, Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." To the extent that the Motion is properly construed as addressing this court's lack of subject matter jurisdiction, the court concludes from Rule 12(h)(3) that Benecke-Kaliko did not waive its right to move for such a determination by doing so after its other Rule 12 motion. *See Wolverine Radio Co.,* 930 F.2d at 1137-38 (parties can neither waive the lack of nor confer by consent federal court subject

5

matter jurisdiction).

## II. Core/Non-Core Analysis

The court's core/non-core analysis begins with the Supreme Court's plurality opinion in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In *Marathon*, the Supreme Court found that the broad grant of jurisdiction to bankruptcy judges by the Bankruptcy Reform Act of 1978 was unconstitutional because, in essence, Congress vested Article III powers in Article I judges. *Marathon*, 458 U.S. at 87. The Court explained that "when Congress creates a statutory right, . . . it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right," but that "[n]o comparable justification exists . . . when the right being adjudicated is not of congressional creation." *Id.* at 83-84. The Court further explained that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages. . . ." *Id.* at 71.

In response to *Marathon,* Congress enacted 28 U.S.C. § 157, which divides all proceedings into two categories: " [1]core proceedings arising under title 11, or arising in a case under title 11" and "[2] proceeding[s] that [are] not core but that [are] otherwise related to a case under title 11." 28 U.S.C. § 157(b)(1) and (c)(1); *Wolverine Radio Co.,* 930 F.2d at 144. Congress did not define "core proceeding." It did, however, provide a non-exhaustive list of matters that are core proceedings. 28 U.S.C. § 157(b)(2). In its core/non-core analysis, the Sixth Circuit has acknowledged that § 157 apparently equates core proceedings with proceedings "arising under" title 11 and "arising in" title 11 cases. *Id.* (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987)). It explained those phrases as follows:

> The phrase "arising under title 11" describes those proceedings that involve a cause of action created or determined by a statutory provision of title 11, "arising in" proceedings are those that, by their very nature, could arise only in bankruptcy cases. Conversely, if the proceeding does not invoke a substantive right created by federal bankruptcy law and is one that could exist outside of the bankruptcy, then it is not a core proceeding. Such a proceeding may be related to the bankruptcy pursuant to sections 1334(b) and 157(c), but it would not be a core proceeding within the meaning of section 157(b).

*Id.*; *see Sanders Confectionery Prod.,* 973 F.2d at 483 ("A core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of bankruptcy."); *Browning v. Levy*, 283 F.3d 761, 773 (6th Cir. 2002) (same).

Notwithstanding this seemingly straightforward interpretation of what constitutes a "core proceeding," courts struggle in its application. In this case, the parties' arguments center around four factors set forth in *In re G.T.L. Corp.*, 211 B.R. 241 (Bankr. N.D. Ohio 1997), that purportedly describe a non-core proceeding. In that case, the court held that a non-core proceeding is one that alleges a cause of action that has all of the following characteristics:

> (1) is not *specifically* identified as a core proceeding under § 157(b)(2)(B) through (N),
>
> (2) existed prior to the filing of the bankruptcy case,
>
> (3) would continue to exist independent of the provisions of Title 11, and
>
> (4) the parties' rights, obligations, or both are not significantly affected as a result of the filing of the bankruptcy case.

*In re GTL Corp.*, 211 B.R. at 246 (emphasis original). These factors were first set forth in *Commercial Heat Treating of Dayton, Inc. v. Atlas Industries, Inc. (In re Commercial Heat Treating of Dayton, Inc.)*, 80 B.R. 880 (Bankr. S.D. Ohio 1987), a decision that predated the Sixth Circuit's opinion in *Wolverine Radio*. Noting that the legislative history indicates that Congress intended the definition of core proceeding to be interpreted broadly, the bankruptcy court held that "unless it appears that a particular proceeding contains the required characteristics of non-core, the proceeding will be determined a core proceeding." *Comm'l Heat Treating of Dayton, Inc.*, 80 B.R. at 888.

While the four characteristics set forth in that case may generally describe the vast majority of non-core proceedings, the second factor is problematic in that it assumes that all causes of action that accrue after the filing of the bankruptcy case are core proceedings. "All proceedings that mature 'during the chapter 11 case do not of necessity become core.'" *BN1 Telecommunications, Inc. v. Lomaz (In re BN1 Telecommunications, Inc.)*, 246 B.R. 845, 849 (B.A.P. 6th Cir. 2000) (quoting *Weeks v. Kramer (In re G. Weeks Sec., Inc.)*, 89 B.R. 697, 708 (Bankr. W.D. Tenn. 1988)). To the extent that a cause of action accrues after the bankruptcy case is filed, does not invoke a substantive right created by the Bankruptcy Code, and could exist outside of bankruptcy, it is not a core proceeding. *See id.*; *Nat'l Century Fin'l Enter., Inc. v. Gulf Ins. Co. (In re Nat'l Century Fin'l Enter.)*, 312 B.R. 344, 351 (Bankr. S.D. Ohio 2004). The four characteristics set forth in *Commercial Heat Treating of Dayton, Inc.* and *In re GTL Corp.* may be factors to consider in making the core/non-core determination, but they are not dispositive. They must be considered in conjunction with the constitutional constraints explained in *Marathon* and the Sixth Circuit's interpretation in *Wolverine Radio.*

When an adversary proceeding presents multiple causes of action, as in this proceeding, courts differ as to whether the core/non-core determination should be made as to the whole proceeding or on a claim-by-claim basis. Some courts will find the entire proceeding core when the core aspect "heavily predominates" and the non-core aspects are not significant. *See, e.g., Hughes-Bechtol, Inc. v. Ohio (In re Hughes-Bechtol, Inc.)*, 141 B.R. 946, 953 (Bankr. S.D. Ohio 1992); *Blackman v. Seton (In re Blackman)*, 55 B.R. 437, 443 (Bankr. D.D.C. 1985). However, this court agrees with the rationale of those courts that have found a claim-by-claim approach to be the only approach consistent with the teachings of *Marathon*. *Halper v. Halper*, 164 F.3d 830, 839 (3rd Cir. 1999); *see also Ralls v. Docktor Pet Centers, Inc.*, 177 B.R. 420, 425 (D. Mass. 1995) ("[T]he word 'proceeding' must refer to the specific causes of action and grounds for relief sought by a party, and not to the entire action. Any broader meaning would fail to comply with the Constitutional concerns of *Marathon*."); *Beneficial Nat'l Bank USA v. Best Receptions Sys., Inc. (In re Best Receptions Sys., Inc.)*, 220 B.R. 932, 946 (Bankr. E.D. Tenn. 1998) (agreeing that "each claim must, on its own, satisfy the requirements of § 157(b)"); *Bliss Tech., Inc. v. HMI Indus., Inc. (In re Bliss Tech, Inc.)*, 307 B.R. 598, 603 (Bankr. E.D. Mich. 2004). The court will therefore determine the core or non-core nature of each of Plaintiff's individual claims, applying the principles set forth above.

### A. Breach of Contract Claims (Counts 1 and 2)

Plaintiff alleges that Benecke-Kaliko breached both the Operating Agreement and the Sales Agreement by, among other things, failing to pay commissions on products it sells in North America. It argues that these claims constitute core proceedings under § 157(b)(2)(A) and (O). As discussed above, in § 157(b)(2), Congress provided a non-exhaustive list of matters that are considered core proceedings, including "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship. . . ." 28 U.S.C. § 157(b)(2)(A) and (O). However, these provisions must be construed in a manner consistent with the constitutional principles set forth in *Marathon*. Thus, courts have found that state law contract claims that do not specifically fall within the categories of core proceedings enumerated in § 157(b)(2)(B) - (N) are related proceedings under § 157(c) even if they arguably fit within the literal wording of the two catchall provisions, §§ 157(b)(2)(A) and (O). *Piombo Corp. v. Castlerock Prop. (In re Castlerock Prop.)*, 781 F.2d 159, 162 (9th Cir. 1986); *Nat'l Century Fin'l Enter., Inc.*, 312 B.R. at 352; *Nationwide Roofing & Sheet Metal, Inc. v. Cincinnati Ins. Co. (Nationwide Roofing & Sheet Metal, Inc.)*, 130 B.R. 768, 775 (Bankr. S.D. Ohio 1991). The Sixth Circuit cases cited by Plaintiff do not require a

8

different result. *See Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.)*, 270 F.3d 280 (6th Cir. 2001) (finding proceeding to be a core proceeding under § 157(b)(2)(O) where issue was whether the government could set off against a prepetition tax debt the debtor's right to a tax refund that arose postpetition); *Cain P'ship, Ltd. v. Pioneer Inv. Servs. Co. (In re Pioneer Inv. Servs. Co.)*, 946 F.2d 445 (6th Cir. 1991) (finding that proceeding was "more properly characterized as noncore" where issue raised was whether debtor's prepetition breach automatically terminated a lease but that the bankruptcy court had the power to hear and determine the proceeding based on implied consent of the parties).

Rather than relying solely on the catchall provisions of § 157(b)(2) as urged by Plaintiff, the court must, therefore, consider Plaintiff's claims in accordance with the Sixth Circuit's direction in *Wolverine Radio.* Plaintiff's contract claims are predicated on state law only. They invoke no substantive right created or determined by federal bankruptcy law and, therefore, do not "arise under title 11." However, Plaintiff contends that the contract claims are core proceedings because they "arise in" Debtors' bankruptcy case. This argument is based on the fact that Benecke-Kaliko's failure to pay commissions continued postpetition and on Plaintiff's contention that Benecke-Kaliko breached the agreements with the intent to force Debtors into bankruptcy. Plaintiff cites, and the court has found, no authority for the proposition that a party's motivation in breaching a contract is a relevant consideration in determining the core/non-core nature of a proceeding. The court finds that a party's motivation cannot transform a non-core matter into a matter that "could arise only in bankruptcy cases." *Wolverine Radio Co.*, 930 F.2d at 1144.

More difficult is Plaintiff's argument that its contract claims "arise in" Debtors' bankruptcy case as a result of Benecke-Kaliko's postpetition breaches. Plaintiff's claims are based upon both prepetition and postpetition breaches. To the extent that Plaintiff seeks damages for prepetition breaches, its contract claims are clearly noncore. *See Beard v. Braunstein*, 914 F.2d 434, 443 (3rd Cir. 1990). However, there is no clear consensus regarding the nature of a proceeding that involves postpetition breaches of a prepetition contract, some courts finding such contract disputes to be core while other courts find them to be non-core proceedings. *Compare Hughes-Bechtol v. Constr. Mgmt.*, 144 B.R. 755 (S.D. Ohio 1992) (finding a proceeding requesting turnover of postpetition accounts receivable based upon a prepetition construction contract to be core where contract involved significant and repeated postpetition transactions); *In re East Hill Mfg. Corp.*, 200 B.R. 535, 538 (D. Vt. 1996) (and cases cited therein), *with Beard*, 914 F.2d at 445 (finding that an action involving prepetition contracts and both prepetition and postpetition breaches to be entirely a non-core matter); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,

9

4 F.3d 1095, 1097, 1102 (2d Cir. 1993) (holding the debtor's action for anticipatory breach of a prepetition contract to be non-core even though the event that triggered debtor's claim occurred postpetition); *Nat'l Enter., Inc. v. Koger P'ship, Ltd. (In re Nat'l Enter., Inc.)*, 128 B.R. 956, 961 (E.D. Va. 1991) (stating that "where, as here, it is clear that the contract underlying the claim is a pre-petition contract that contemplated neither dealing with a bankrupt estate nor consenting to the jurisdiction of the bankruptcy court, some affirmative interaction between the non-debtor contracting party and the estate must exist for the matter to be considered a core action, subject to the full panoply of the bankruptcy court's power"); *see Daewoo Motor Am. v. Gulf Ins. Co. (In re Daewoo Motor Am., Inc.)*, 302 B.R. 308, 309, 313 (C.D. Cal. 2003) (finding that postpetition claims on a prepetition insurance contract were non-core and stating that "resolution of this case will merely augment the assets of the estate rather than having a direct impact on the bankruptcy court's core administrative functions.").

Based upon the Sixth Circuit's definition of "arising in" proceedings in *Wolverine Radio* and *Sanders Confectionery Products, Inc.*, the court concludes that Plaintiff's claims alleging both prepetition and postpetition breaches of prepetition contracts do not "arise in" Debtors' bankruptcy case. Rather, they constitute non-core proceedings that are simply related to Debtors' bankruptcy case because they could have been pursued outside of bankruptcy and remain unaffected by the filing of Debtors' bankruptcy case. As one court noted, "courts which have held that the post-petition breach of a pre-petition contract is a core proceeding tread too close to the jurisdictional limitations of Bankruptcy Courts set by the Supreme Court in [*Marathon*]" and "have not defined core proceedings in a manner similar to that set forth by the Sixth Circuit. . . ." *Beerman-Peal Holdings, Inc. v. Carson Pirie Scott & Co. (In re Elder-Beerman Stores Corp.)*, Case No. 95-33643, 1997 WL 1774875, *4, 1997 U.S. Dist. LEXIS 23784, *19 (S.D. Ohio Aug. 1, 1997); *cf. Castlerock Prop.*, 781 F.2d at 162 (stating that "a court should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems.").

### B. Unjust Enrichment Claim (Count 3)

Plaintiff's unjust enrichment claim is an alternative state law claim to its claims of breach of contract. *See Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Educ.*, Case No. 08AP-396, 2008 Ohio App. LEXIS 5367, **18, 2008 WL 5160165, *7 (Ohio App. Dec. 9, 2008) (citing *Hummel v. Hummel*, 133 Ohio St. 520, 525-528 (1938), for the proposition that the doctrine of unjust enrichment is "an equitable remedy applicable only when the court finds there is no contract"). While Ohio law does not generally permit recovery on the basis of unjust enrichment when an express contract covers the same subject, unjust

10

enrichment may be pled in the alternative when the existence of an express contract is in dispute and may be maintained despite an express contract when there is evidence of fraud, bad faith or illegality. *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F. Supp. 2d 763 (N.D. Ohio 2004).

Plaintiff alleges that Benecke-Kaliko was unjustly enriched when it received the benefit of Debtors' technical support, customer service, and sales and marketing assistance without paying for such services. To the extent Plaintiff's claim seeks reimbursement for prepetition benefits conferred by Debtor's services upon Defendant, it clearly does not involve a right created or determined by a statutory provision of title 11 and could have been pursued outside of bankruptcy. *See, e.g., Hankin v. Auxiliary of the Winsted Memorial Hosp. (In re Winsted Memorial Hosp.)*, 236 B.R. 556, 561 (Bankr. D. Conn. 1999).

The Amended Complaint does not specifically allege when Debtors stopped providing services to Benecke-Kaliko. In its response to Defendant's Motion, Plaintiff states that Benecke-Kaliko used Debtors' services until some time after Debtors filed for bankruptcy relief. The court finds that the fact of postpetition benefits conferred on Defendant by the Debtors-in-Possession would not transform the unjust enrichment claim into a core proceeding. To the extent this claim also involves post-petition benefits conferred on Defendant by the Debtors-in-Possession, the court cannot find any meaningful jurisdictional distinction between the breach of contract claims, which the court has determined are noncore claims notwithstanding that some damages are alleged to have occurred postpetition, and the unjust enrichment claim such that the latter can properly be characterized as a core proceeding. Indeed unjust enrichment claims are often characterized under Ohio law as sounding in "quasi-contract." *E.g. Hummel*, 133 Ohio St. at 525; *Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 825 (S.D. Ohio 2007).

The court concludes that Plaintiff's unjust enrichment claim is related to Debtors' chapter 11 case but is a not a core proceeding.

### C. Breach of Fiduciary Duty (Count 4)

In Count 4 of the Amended Complaint, Plaintiff alleges that Benecke-Kaliko breached fiduciary duties owed to Debtors both prepetition and postpetition.[3] Prepetition claims of breach of fiduciary duty

---

[3] In its order denying Defendant's motion to dismiss, the court found that, under Ohio Revised Code § 1705.29(B), as a member of SAI Holdings, "Benecke-Kaliko owed a duty of 'utmost good faith and honesty' in all dealings relating to the company" and "was required to 'perform [its] duties as a manager in good faith, in a manner [it] reasonably believe[d] to be in or not opposed to the best interests of the company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances.'" [Doc. # 45].

11

are clearly not core proceedings, *see Bliss Tech., Inc. v. HMI Indus., Inc. (In re Bliss Tech., Inc.)*, 307 B.R. at 608-09 (finding that a state-law breach of fiduciary duty claim based on prepetition conduct cannot constitutionally fit within the catchall provisions of § 157(b)(2)(A) and (O) and does not satisfy the standard for a core proceeding set forth in *Wolverine Radio*); *Messinger v. Chubb Group of Ins. Co.*, Case No. 1:06MC00121, 2007 U.S. Dist. LEXIS 35842, *6, 2007 WL 1466835, *2 (N.D. Ohio May 16, 2007) (finding that such claims "seek to adjudicate primarily private causes of action, . . . distinct from the restructuring of debtor-creditor relations, which forms the heart of the federal bankruptcy court's jurisdiction"). Plaintiff does not argue otherwise.

Rather, in arguing that its claim is core, Plaintiff focuses only on its allegation that after Debtors filed their bankruptcy petition, Benecke-Kaliko breached its fiduciary duties when its chief executive officers met with the chief executive officers of Debtors' primary customer, Lear Corporation ("Lear"), in order to discuss the possibility of Benecke-Kaliko purchasing certain business assets of the Debtor entities through the bankruptcy process. At that meeting, Plaintiff alleges that Benecke-Kaliko characterized Debtors' management as "inefficient, ineffective and dishonest" for no legitimate reason. [Doc. # 4, Amended Complaint, ¶ 46-48]. Plaintiff alleges that Benecke-Kaliko did so in an attempt to lower the sale price and purchase the Debtor entities at a bargain price. [*Id.* at ¶ 49]. Plaintiff further alleges that as a result of Benecke-Kaliko's disparagement of the Debtors, Lear resourced all of its work from Debtors and effectively put them out of business, leading to Debtors having to sell their assets piecemeal for much less than what could have been obtained by selling the business as a going concern. [*Id.* at ¶¶ 50-57, 81]. Plaintiff argues that the damages from Benecke-Kaliko's actions are "enormous," affecting every stakeholder in the Debtors' underlying bankruptcy cases and resulted in Debtors' plan of liquidation being dramatically altered. Plaintiff further argues that Benecke-Kaliko used a meeting "required by, and [which] took place pursuant to, the Court's post-petition financing order" to disparage Debtors' management. [Doc. # 37, p. 6]. Plaintiff contends that its claim is, therefore, a core proceeding under § 157(b)(2)(A) and (O) because Benecke-Kaliko's actions affected the administration and liquidation of the assets of the estate and is "inexorably tied to and wound up in the bankruptcy process itself." [*Id.* at 4, 6]. However, applying the principles set forth in *Marathon* and *Wolverine Radio*, the court finds that Plaintiff's postpetition breach of fiduciary duty claim is not a core proceeding.

Plaintiff's claim does not fall within the list of matters specifically designated as "core" in § 157(b)(2). There is no question that, if Plaintiff's allegations are true, Benecke-Kaliko's actions affected

12

the administration and liquidation of estate assets. However, as discussed above, when "core" jurisdiction is premised on § 157(b)(2)(A) or (O) as Plaintiff urges in this case, the court must still find that the claim involves a cause of action created or determined by a statutory provision of title 11 or, by its very nature, could arise only in a bankruptcy case. *See Wolverine Radio Co.*, 930 F.2d at 1144. It is not enough that the event that forms the basis of the claim occurred postpetition. *Weeks*, 89 B.R. at 708 (stating that "the Court makes a distinction between 'arising in a case' and arising during a case).

Here, Plaintiff's cause of action is created by, and will be determined by, state law and, therefore, does not arise under title 11. Notwithstanding that the allegedly slanderous remarks about Debtors' management occurred at a meeting with Debtors' largest customer to discuss purchasing business assets of the Debtor entities, the court is not persuaded that its breach of fiduciary duty claim is "inexorably tied to and wound up in the bankruptcy process" such that "arising in" jurisdiction is allocated to this court. Although Plaintiff cites no authority for this argument, the court is aware of one case in which the Sixth Circuit concluded that the plaintiff's postpetition state-law claims brought against the chapter 7 trustee's attorney were core proceedings because the basis for the plaintiff's claims was "inextricably bound to the bankruptcy proceeding." *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006). However, the court finds *Lowenbraun* distinguishable.

In *Lowenbraun*, the non-debtor plaintiff alleged claims of libel, slander, abuse of process and outrageous conduct against the attorney for the chapter 7 trustee. Her claims were based on statements made by counsel in connection with his filing of a contempt motion due to the plaintiff's failure to transfer certain funds belonging to the bankruptcy estate in accordance with an adversary proceeding settlement agreement. The court concluded that the action was a core proceeding because the plaintiff's claims would not exist but for the bankruptcy proceeding and because the chapter 7 trustee's attorney, whom it found to be the functional equivalent of the trustee, filed the contempt motion to assist in the administration of the estate. *Id.* The court found support for its conclusion in cases holding that state-law causes of action *against* officers of the bankruptcy estate were core proceedings where such causes of action arose out of the performance of the officers' official duties. *Sanders Confectionery Prod.*, 973 F.2d at 483; *Kirk v. Hendon (In re Heinsohn)*, 247 B.R. 237, 244 (E.D. Tenn. 2000) (finding plaintiff's claims against bankruptcy trustee for malicious prosecution and defamation based on the trustee referring case for prosecution on bankruptcy fraud charges were core proceedings because the conduct about which the plaintiff complained "would not have arisen but for Defendant's obligations and conduct as a trustee");

13

*Honigman, Miller, Schwartz & Cohn v. Weitzman (In re Delorean Motor Co.)*, 155 B.R. 521, 525 (B.A.P. 9th Cir. 1993) (finding plaintiff's malicious prosecution claim against attorney for the chapter 7 trustee based upon a fraudulent conveyance action brought by the trustee was a core proceeding because, "the action arises from the efforts of officers of the estate to administer the estate and collect its assets" and is "inextricably tied" to the determination of an administrative claim against the estate and the proper administration of the estate).

Unlike *Lowenbraun* and the cases cited therein, Plaintiff's breach of fiduciary duty claim is not based upon conduct arising out of any obligation imposed by bankruptcy laws. To the extent that Plaintiff argues that Benecke-Kaliko's alleged slanderous remarks were made at a meeting with Lear that was required by, and took place pursuant to, this court's postpetition financing order, it overstates the provisions of the court's financing order. In connection with the court's order that the automatic stay shall not apply to actions taken by Lear to resource its business, the court stated only that "Lear agrees to have discussions regarding future business . . . with prospective purchasers of the Debtors' Athol business assets. . . ." [Case No. 06-33227, Doc. # 396]. The court believes this nexus with the bankruptcy case is insufficient to constitutionally allocate core status to the claim. "In other words, an 'arising in' proceeding is one that must not only arise from events in the bankruptcy case but that by its nature is of an 'administrative' character because it requires a disposition in the bankruptcy case in order for the bankruptcy case to be administered." *Virginia Hosp. Center-Arlington Health System v. Akl (In re Akl)*, 397 B.R. 546, 550 (Bankr. D.D.C. 2008). Determining Plaintiff's breach of fiduciary duty claim is not "inextricably tied" to any other determination the court must make with respect to Debtors' bankruptcy proceeding.

The court also finds unpersuasive Plaintiff's argument that its claim is a core proceeding because the conduct complained of resulted in postpetition damages, including the inability to sell Debtors' business as a going concern. Rather, as with the contract claims, the court must focus on the claim itself and not just on the timing of the alleged resulting damages. Debtors' chapter 11 case was the setting within which Defendant acted in a manner allegedly designed to harm Debtors, but the breach of fiduciary claim based on those actions would exist whether those acts took place in the bankruptcy case or outside of the bankruptcy case.

For the foregoing reasons, the court concludes that while Plaintiff's breach of fiduciary duty claim is "related to" Debtors' bankruptcy case in that the assets available for distribution to creditors under the confirmed chapter 11 plan of reorganization will be greater if Plaintiff prevails, it is not a core proceeding

14

as it is not a claim that is created or determined by bankruptcy law, nor is it a claim that could not exist outside of bankruptcy.

## **CONCLUSION**

For the foregoing reasons, the court finds that Plaintiff's breach of contract claims (Counts 1 and 2), unjust enrichment claim (Count 3) and breach of fiduciary duty claims (Count 4) are not core proceedings but are otherwise related to Debtors' bankruptcy case within the meaning of § 157(c)(1). Defendant's motion requesting an order finding that this is not a core proceeding [Doc. #31] is hereby granted.

**IT IS SO ORDERED.**